IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| INTEGRATED GENOMICS, INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 07 C 5860 |
| TILLMAN GERNGROSS, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Integrated Genomics, Inc., has sued Tillman Gerngross, asserting two claims of breach of contract and one claim of fraudulent misrepresentation. Gerngross has moved for summary judgment on all counts, and Integrated Genomics has moved for summary judgment on the contract claims.

**Background**

Because the parties have filed cross-motions for summary judgment, the Court "construe[s] the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Crews v. City of Mt. Vernon*, 567 F.3d 860, 864 (7th Cir. 2009).

Integrated Genomics provides gene sequencing data and services to academic researchers and commercial clients. In 2002 to 2003, the fees it charged for sequencing data varied by customer type. It was common in the industry at the time to charge academic researchers a relatively low license fee but to charge commercial

1

clients a much higher fee. The cost of a commercial license depended upon factors such as the terms of the license and the quality of the data to be delivered.

By 2002, Integrated Genomics had developed genomic sequencing for *Pichia pastoris*, a common yeast. At that time, it was the only source from which the data could be licensed. Integrated Genomics negotiated, but never closed, potential licensing deals for *Pichia* data with two commercial clients. For these deals, Integrated Genomics quoted license fees ranging from the high six-figure to low seven-figure range.

Tillman Gerngross was a professor at Dartmouth College. He also co-founded GlycoFi in 2000 and served as its Chief Scientific Officer until August 2007, when the company was sold to Merck & Co. Gerngross devised a system by which yeasts, like *Pichia pastoris*, could be genetically modified to express proteins in a way similar to human cells.

GlycoFi was "incubated" within Gerngross's department at Dartmouth before the company acquired its own facilities in December 2002. With the college's permission, Gerngross used Dartmouth facilities to do GlycoFi business. Dartmouth also purchased items for, and was later reimbursed by, GlycoFi.

Shortly before April 2002, Gerngross contacted Integrated Genomics seeking to license *Pichia pastoris* genomic sequencing data. Gerngross testified during his deposition that he spoke with Yakov Kogan of Integrated Genomics at that time. According to Gerngross, they discussed the quality of the data, which was a "rough draft" and "reflected merely 3x coverage," and agreed on a price of $5,000. Def. Mot. at 2. Kogan does not recall speaking to Gerngross at that time. In fact, Kogan testified in

2

his deposition that he was not involved in negotiations to sell the information to Gerngross. He also testified that he would not have had much contact with potential customers in April 2002 due to the nature of his position with Integrated Genomics at the time.

In April 2002, Gerngross spoke with Yuri Nikolsky, then Vice-President of Business Development at Integrated Genomics. According to Gerngross, Nikolsky sent him a form contract containing several terms that would have encumbered any commercial application of the technology he was developing. Gerngross does not recall the specifics of what he told Nikolsky, but he testified that he mentioned that he was involved in a commercial effort. Gerngross also testified that Nikolsky expressed a desire to proceed with the transaction but that Integrated Genomics was concerned about the information entering the public domain. In response to those concerns, he sent a letter to Nikolsky detailing certain agreed-upon restrictions. This letter stated:

> This is to state the restrictions that apply to the data that we are obtaining from Integrated Genomics. My research group at Dartmouth College is restricted to the publication of no more than 10kb [ten kilobases] of sequencing data from the Pichia genome per calendar year. This restriction is void if the genome data becomes available from a public domain at not [sic] charge.

Def. Mot., Ex. A1 at IGI 00005. On Gerngross's instructions, Nikolsky faxed the invoice to Gerngross's Dartmouth College address and received a check for $5,000 from Dartmouth College the following day. Integrated Genomics then sent Gerngross a CD containing the *Pichia* data.

Nikolsky could not remember whether Gerngross informed him that he was involved in a commercial effort or whether he planned to use the *Pichia* data for commercial purposes, but he testified during his deposition that he considered

Gerngross to be an academic customer. Both Nikolsky and Kogan testified that they did not believe that Gerngross had lied to them.

Between December 2002 and May 2003, Gerngross and Kogan, who had replaced Nikolsky by that time, discussed another deal for the sequencing of a different organism. In December 2002, Kogan sent Gerngross an e-mail in which he stated, "Sometimes [sic] I would like to talk to you as the CSO of the [sic] GlycoFi." Def. Mot. Ex. A6 at TG-88. Kogan testified that he learned of Gerngross's affiliation with GlycoFi sometime before he sent this e-mail. In May 2003, Integrated Genomics delivered an updated version of the *Pichia* data to Gerngross at his Dartmouth College address.

In 2006, Merck & Co. acquired GlycoFi in its entirety, including the computers that contained *Pichia* data.

## Discussion

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### A. Breach of contract

"In order to show a breach of contract, a plaintiff must show that (a) a contract exists between plaintiff and defendant, (b) plaintiff performed her obligations under the contract, (c) defendant did not perform his obligations under the contract, and (d) damages resulted from the breach." *Walker v. Ridgeview Const. Co.*, 316 Ill. App. 3d 592, 596, 736 N.E.2d 1184, 1187 (2000). A court's objective in construing a contract is to "give effect to the intent of the parties." *Gallagher v. Lenart*, 226 Ill. 2d 208, 232, 874 N.E.2d 43, 58 (2007) (citations omitted). The best indication of the parties' intent is the plain and ordinary meaning of the language of the contract. *Id.* "Moreover, because the words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* If the language of a contract is ambiguous—that is, susceptible to more than one reasonable interpretation—then a court may consider extrinsic evidence of intent. *Id.* Contract terms are not ambiguous, however, "simply because the parties can suggest creative possibilities for their meaning, and a court will not search for ambiguity where there is none." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 363, 860 N.E.2d 307, 314 (2006) (citations omitted).

Integrated Genomics advances two claims of breach of contract. First, it alleges that Gerngross breached an oral contract that it contends restricted his use of the *Pichia* sequence to academic use only. Second, it alleges that Gerngross breached a written contract that, according to Integrated Genomics, restricted use and disclosure of the *Pichia* data.

Gerngross contends that Integrated Genomics has failed to produce any evidence that the parties agreed to restrict commercial use of the *Pichia* data. He contends that the letter sent by Gerngross to Nikolsky was the final expression of the parties' agreement regarding use of the data. Because it contains no restriction on commercial use, Gerngross argues, no such restriction existed.

Integrated Genomics contends that it sold Gerngross the data with the understanding, created by Gerngross, that it would be used only for academic purposes. To attempt to prove that an oral contract to this effect existed, Integrated Genomics relies on Gerngross's allegedly misleading use of his Dartmouth College contact information and the testimony of Nikolsky and Kogan, neither of whom could recall whether Gerngross told them about his commercial venture. Even when viewed in the light most favorable to Integrated Genomics, this is insufficient to raise a genuine issue of fact with respect to the existence of an oral contract restricting commercial use of the *Pichia* sequence. Although Gerngross's use of his Dartmouth College contact information might support Integrated Genomics' fraud claim, it does not show that the parties agreed to forbid commercial use. Likewise, Kogan and Nikolsky's lack of recollection does not support the existence of such a contract.

The Court turns next to Integrated Genomics' claim for breach of a written contract, specifically, the letter that Gerngross sent to Integrated Genomics. Integrated Genomics contends that the reference to "My research group at Dartmouth College," contained in that letter, implicitly restricted Gerngross to academic use only. That provision, however, only restricts the research group from publishing more than ten kilobases of *Pichia* data per year. There is no other restriction on the use of the data.

Integrated Genomics contends that Gerngross breached the parties' agreement by "publishing" the entire sequence to GlycoFi and then to Merck. Gerngross contends that publication limitation restricted only communication or dissemination to the public at large (which is not claimed to have occurred), not disclosure to one or two entities. Integrated Genomics argues that "publication" as used in the agreement should not be construed so narrowly but rather should be read to impose limitations on any disclosure to a third party.

Each side relies on the *Valley Forge* case to support its interpretation of the term "publication." The court in *Valley Forge* relied on the dictionary definition of publication, which it stated was "'communication (as of news or information) to the public' and alternatively, [ ] 'the act or process of issuing copies . . . for general distribution to the public.'" *Valley Forge Ins. Co.*, 223 Ill. 2d at 366, 860 N.E.2d at 316 (quoting Webster's Third New Int'l Dictionary 1836 (2002)). The court concluded that the defendant's act of faxing advertisements to a proposed class constituted publication "both in the general sense of communicating information to the public and in the sense of distributing copies of the advertisements to the public." *Id.* Integrated Genomics contends that the court did not limit its interpretation of publication to wide distribution but instead acknowledged that disclosure to a single person was sufficient to constitute publication. Although the court in *Valley Forge* upheld the lower court's ruling, in which that court reasoned that publication is not limited to transmittals to third parties, it held that publication means the communication of information to the public. *Id. See also TIG Ins. Co. v. Dallas Basketball, Ltd.*, 129 S.W.3d 232, 238 (Tex. App. 2004) ("The word

7

'publish' is generally understood to mean disclosure, circulate, or prepare and issue printed material for public distribution."). Thus, the Illinois Supreme Court has defined publication according to its ordinary meaning, which involves public disclosure. There is no basis to conclude that the term should be interpreted differently in the present case.[1] As a result, disclosure to GlycoFi or to Merck and not to the public is insufficient to establish that Gerngross engaged in "publication" in breach of the written contract.

**B.    Fraudulent misrepresentation**

"The elements of the tort of fraudulent misrepresentation are: (1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 193, 538 N.E.2d 530, 536 (1989) (internal quotation marks and citations omitted).

Gerngross contends that Integrated Genomics has failed to produce evidence of any false statement. He contends that his unrebutted deposition testimony demonstrates that he disclosed his commercial intentions to Integrated Genomics. But although Gerngross testified that he remembers mentioning that he was involved in a commercial effort, he did not testify that he disclosed to Nikolsky his intention to use the *Pichia* data for commercial purposes. He testified that he told Kogan in 2002 of his intention to use the data for a commercial venture, but Kogan testified that he never spoke to Gerngross in 2002. Furthermore, given Gerngross's admittedly poor memory

---

[1] There is no basis for a determination that this term of the contract is ambiguous.

on the subject, a fact finder reasonably could decline to credit his testimony.

Gerngross also contends that Integrated Genomics did not actually rely on his alleged statements, because Nikolsky testified that if a person's affiliation "was a university, that would be considered academic" use. Def. Mot., Ex. B27 at 56. Nikolsky's statement could be understood, however, to mean that if the use was in conjunction with a university project, the use would be considered academic. In addition, there is other evidence that would support a finding that Integrated Genomics relied on Gerngross's representations. For example, Kogan's e-mail to Gerngross in 2003—indicating that Kogan wanted to speak to Gerngross as the CSO of GlycoFi—arguably implies that their prior dealings did not involve GlycoFi business. From this and the considerable difference in price between the proposed commercial deals and Gerngross's, a reasonable fact finder could infer that Integrated Genomics relied on Gerngross's representations when it sold the *Pichia* sequencing data to him at a lower price. As a result, genuine issues of material fact exist, making summary judgment inappropriate on Integrated Genomics' fraud claim.

**C.     Damages**

Gerngross contends that Integrated Genomics has failed to produce non-speculative evidence of damages arising from the alleged fraud.[2] Because Integrated Genomics had no sales of similar products or licensing arrangements to commercial customers in 2002 or 2003, Gerngross contends that any damages calculation

---

[2] Because the Court has determined that Gerngross is entitled to summary judgment on liability for breach of contract, it need not consider the damages issue in that context.

necessarily would be too speculative to pass muster.

Damages cannot be based on speculation or conjecture, but they "need not be proven with the certainty of calculus." *BE&K Const. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 770 (7th Cir. 1998). "Damages are speculative when uncertainty exists as to the fact of damages, rather than to the amount of such damages." *Beerman v. Graff*, 250 Ill. App. 3d 632, 639, 621 N.E.2d 173, 179 (1993).

Viewed in the light most favorable to Integrated Genomics, the evidence reasonably would support a finding that the company was damaged. A reasonable fact finder could conclude that Integrated Genomics sold the *Pichia* data to Gerngross for much less than that it would have insisted upon had Gerngross disclosed that the data was to be used for commercial purposes at GlycoFi rather than in his academic work at Dartmouth College. Gerngross contends that Integrated Genomics' lack of evidence concerning comparable deals dooms its claim for damages. As Integrated Genomics contends, however, a fact finder reasonably could determine that it is partly because of Gerngross's alleged wrongdoing that such evidence does not exist. *See BE&K*, 156 F.3d at 770 ("where, as here, the uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created").

Gerngross contends that both *BE&K* and *Beerman* are distinguishable because the plaintiffs in those cases produced more definite evidence of damages. Though this may be true, neither of those cases indicates that less-precise evidence is unacceptable as a matter of law. The fact that Integrated Genomics failed to close any

commercial deals at the price it sought is evidence supporting a contention that its provable damages might be less than what it demanded, but it does not render the claim speculative.

**Conclusion**

For the foregoing reasons, the Court denies plaintiff's motion for summary judgment [docket no. 93] and grants defendant's motion [docket no. 89] with respect to Counts 1 and 2, but otherwise denies the motion. The case remains set for a bench trial on Count 3 on September 14, 2009 at 9:45 a.m.

```
                                              _____
                                                  MATTHEW F. KENNELLY
                                                  United States District Judge
```

Date: July 7, 2009