**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Integrated Genomics, Inc. | ) | |
| A Delaware Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   07-5860 |
| | ) | |
| | ) | Honorable Matthew J. Kennelly |
| Tillman Gerngross, | ) | |
| | ) | Magistrate Judge Schenkier |
| Defendant. | ) | |

**PLAINTIFF'S MOTION TO ALTER OR AMEND
THE OCTOBER 7, 2009 JUDGMENT**

Plaintiff, Integrated Genomics, Inc. ("IG"), pursuant to Federal Rule of Civil
Procedure 59, respectfully requests that the Court alter or amend its Judgment Order of
October 7, 2009 ("Order").

The Court held that defendant "Gerngross did not disclose to IG his affiliation
with GlycoFi, Inc. or his intended commercial use of the Pichia pastoris data. Rather,
his conduct left IG's personnel, and would have left any reasonable person in their
position, with the belief that Gerngross was acting in the capacity of an academic
researcher. (Order at 4). The Court concluded that "IG has failed to show by clear and
convincing evidence, however, that the undisclosed information was material or that it
would have acted differently had it known of Gerngross's commercial affiliation." (Order
at 8).

A misrepresentation is "material" if it relates to a matter upon which plaintiff could
be expected to rely in determining to engage in the conduct in question. Barrington

*Press, Inc. v. Morey*, 752 F.2d 307, 310 (7th Cir. 1985) (quoting Mother Earth, Ltd. v.

Strawberry Camel, Ltd., 72 Ill. App. 3d 37, 49, 390 N.E.2d 393, 404 (1st Dist. 1973)).

The evidence firmly established that IG relied upon Gerngross' representation that he

was a professor at Dartmouth when it quoted him the deeply discounted academic price

for the Pichia data.  (Deposition of Michael Fonstein ("Fonstein") at 46-47; Deposition of

Yuri Nikolsky ("Nikolsky") at 40; 55; 59; 66).   The evidence at trial was uncontroverted

that if Gerngross had disclosed to IG commercial affiliation, IG would have required

more restrictions on his use of the data.  (Transcript ("T.") at 48-51; DX 19; PX 8, 9, 16

and 17; Nikolsky at 74)

     IG established that if Gerngross had disclosed in 2002 that he was dealing for a

commercial entity, GlycoFi, and not Dartmouth College, it would have been IG's practice

to then negotiate firm terms regarding exclusivity, deliverables, price and other terms of

the agreement.  (Nikolsky at 79).  But, this did not happen, because Gerngross never

disclosed his commercial affiliation.

     The evidence was undisputed that Gerngross was not acting as an academic

researcher.  It was very important to him that his invention be unencumbered by any

royalties, as he had personally seen happen to other spin-outs. (T.191-94).  Therefore,

Gerngross made very sure that Dartmouth could never claim any rights to his invention

or pending provisional patent application, and Dartmouth had signed off any rights long

before Gerngross first contacted IG.  (T. at 196-98; PX 5 and 7).  While he touted his

affiliation with Dartmouth when dealing with IG, sending a letter to Yuri Nikolsky on

Dartmouth letterhead referencing his "research group at Dartmouth College," (JX 1),

Gerngross's technology was not, and never had been, a Dartmouth project. Dartmouth was nothing more than a landlord and shareholder.

The Court, characterizing Gerngross as a dual-affiliated entity, concluded that IG did not establish that it had a hard-and-fast practice at the time of charging more to dual-affiliation customers like Gerngross, or that IG would have charged him more had it been aware that Gerngross would use the data for GlycoFi's work, and not Dartmouth's. (Order at 9). However, John Campbell detailed IG's transaction with Altana Pharma AG, a similar "dual-affiliation" situation. (T. at 48-51; 86-90; DX 18, 19, 20 and 21). This evidence was undisputed. Altana was a commercial entity that was doing research with a graduate student - an academic use. The license was priced at $30,000, for an academic entity. (T. at 88). However, the contract was for a circumscribed project; there was a time limitation on it, and the license did not allow redistribution, because IG did not want its data going to Altana. (T. at 87, 89; DX 19). Altana's license fee was higher than that charged Gerngross, $30,000 versus $5,000; Altana had a time limitation; and Altana was not allowed to redistribute the data. Gerngross avoided the limitations and higher price because he never disclosed his dual commercial/academic affiliation.

IG's evidence also established that many entities took both an academic license, and then a commercial one, because IG considered an academic use to be for research resulting in publication. (T. at 51-52; Nikolsky at 74). IG was willing and able to offer Gerngross a commercial license, with an exclusive field of use (T. 56). However, because IG relied upon Gerngross's representation that he was just an academic rather

3

than acting on behalf of a commercial entity, IG was deprived of the opportunity to negotiate a commercial license to him.

Yuri Nikolsky negotiated the transaction with Gerngross, believing that Gerngross was an academic and entitled to the discounted academic rate; in a larger or unusual deal, Michael Fonstein, IG's CEO, would be involved in the negotiation.  (Nikolsky at 14; Fonstein at 22-23, 37).  Fonstein testified that during the 2001 and 2002 time period, he was negotiating commercial contracts for the Pichia data, and entered into other contracts for similar fungal genomes, in the in the high six and seven digits and. (Fonstein at 10, 41-44; 49; PX 8 and 9).  Because Nikolsky relied upon Gerngross' misrepresentation of the entity on whose behalf he was dealing, Fonstein was never involved with transaction.  Nikolsky also testified that IG typically sent a standard agreement, such as PX 8 or 9, to people seeking to license genomic data.  (Nikolsky at 63)  That practice was not followed in this instance because of the size of the deal (Id.). However, the only reason the deal was that small was because of Gerngross's misrepresentation.

The Court concluded that there was no evidence that "Integrated Genomics asked Gerngross how he intended to use the Pichia data." (Order at 9.)  Again, that was because Gerngross misrepresented for whom he was acting.  At that time, academic researchers typically just wanted to publish the results of their research.  (Nikolsky at 66, 74).  Thus, IG placed a restriction on the amount of IG's genomic data that Gerngross could publish.  The evidence demonstrated that if Gerngross had truthfully represented the entity that was to receive the data – GlycoFi, and not Dartmouth – IG

would have imposed additional restrictions on the use of the data, as it did with Altana and other commercial entities.  (DX 19; PX 8 and 9).

The Court found, "In addition, there is no evidence that Integrated Genomics asked Gerngross how he intended to use the Pichia Data.  The evidence reflects that at the time in question, Integrated Genomics was not particularly careful about such matters, which is consistent with its failure to inquire into Gerngross' purpose." (Order at 9)  There was no reason for IG to interrogate Gerngross about his proposed use of the data.  Gerngross portrayed himself as an academic, and typically academics just wanted to publish the results of their research. (Nikolsky at 66, 74)  Thus, when IG first provided the Pichia data in 2002, it did exercise due care – it restricted the amount of data that Gerngross could publish. (JX1).  Furthermore, Gerngross confirmed that at when he received the update from John Campbell in 2003, he considered the restriction to apply to the new data.  (T.  at 186).  For his part, Campbell demanded no additional restrictions on Gerngross's use of the data because he, like Nikolsky, believed he was dealing with Gerngross as solely an academic.  (T. at 39).

Finally, allowing Gerngross to avoid liability because IG did not establish its procedure for dual-affiliated entities or investigate Gerngross's purpose for acquiring the data gives Gerngross the benefit of his misrepresentation.  Indeed, in his transaction with IG, Gerngross was not a dual-affiliated entity.  On the one hand, each of the persons with whom he dealt with IG considered him to be an academic researcher.  In reality, and unbeknownst to IG, Gerngross was at all times acting solely for the benefit of GlycoFi, having ensured that Dartmouth could have no claim to GlycoFi's technology. (PX 5 and 7).  Nevertheless, Gerngross took advantage of the common industry

practice of giving discounts to academics.  (Fonstein at 46-47; Nikolsky at 40, 55, 59, 66)

IG presented substantial and uncontroverted evidence that Gerngross's misrepresentation of his role and his acquisition of IG's data for GlycoFi, and only GlycoFi, was material.  For the foregoing reasons, IG asks that the Court amend its judgment of October 7, 2009.

Respectfully submitted,

Dated: October 19, 2009

s/ Annette M. McGarry
Attorney for Plaintiff

Annette M. McGarry (#6205751)
    amm@mcgarryllc.com
Marianne C. Holzhall (#6304057)
    mch@mcgarryllc.com
McGarry & McGarry, LLC
120 North LaSalle Street
Suite 1100
Chicago, IL 60602
(312) 345-4600
FAX (312) 345-4601

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2009, the foregoing PLAINTIFF'S MOTION TO ALTER OR AMEND THE OCTOBER 7, 2009 JUDGMENT was electronically filed on all attorneys of record using the CM/ECF system.


<u>/s/ Annette M. McGarry</u>